**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES TRADING
COMMISSION,

        Plaintiff,

        v.

DAVID SMOTHERMON,

        Defendant.

Case No. 19-CV-4185

## <u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.    The Commission's allegations relate solely to internal recordkeeping and internal corporate affairs rather than market-facing conduct. ......................................................... 2

II.   The Commission's Causes of Action ........................................................................ 3

STANDARDS OF REVIEW ............................................................................................. 4

I.    Rule 12(b)(6) – Failure to State a Claim ................................................................... 4

II.   Rule 9(b) – Heightened Pleading for Fraud .............................................................. 4

ARGUMENT ..................................................................................................................... 5

I.    The CFTC's anti-fraud authority encompasses market fraud, not internal corporate recordkeeping. ........................................................................................................... 5

II.   The Commission has failed to plausibly allege deceptive conduct "in connection with" a regulated transaction. .............................................................................................. 9

     A.   Post-trade T&T System entries intended to conceal losses from an employer lack the requisite connection to a regulated transaction. ........................................... 9

     B.   Any alleged T&T System adjustments would not have impacted public investors. .......... 10

          1.   The Commission's focus on internal recordkeeping represents a fundamental departure from the CEA's "in connection with" requirement. ...................................... 10

          2.   Internal T&T System entries cannot alter the economic terms of transactions dictated by the exchange. ............................................................. 13

     C.   The Commission's claims must be dismissed because the Complaint fails to plausibly allege either transaction or loss causation as required by Section 6(c)(1) of the CEA and Rule 180.1. .................................................................... 14

     D.   Smothermon and the Company were not subject to CFTC registration and thus owed no reporting or disclosure obligations that could have influenced the commodities market. 17

III.  The Complaint fails Rule 9(b) by substituting a few isolated examples for the particularity required to plead an alleged nine-month fraudulent scheme. .............................. 19

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...................................................................................4

*Bartels v. Clayton Brokerage Co. of St. Louis, Inc.*,
   631 F. Supp. 442 (S.D.N.Y. 1986) ......................................................................4

*Bittner v. United States*,
   598 U.S. 85 (2023) ................................................................................................8

*In re Carter–Wallace, Inc. Secs. Litig.*,
   150 F.3d 153 (2d Cir. 1998) ..........................................................................11, 15

*Commodity Futures Trading Comm'n v. Vartuli*,
   228 F.3d 94 (2d Cir. 2000) ...................................................................................9

*Gamm v. Sanderson Farms, Inc.*,
   944 F.3d 455 (2d Cir. 2019) .............................................................................5, 20

*Kearney v. Prudential-Bache Sec., Inc.*,
   701 F. Supp. 416 (S.D.N.Y. 1988) ..................................................................6, 11

*Krukever v. TD Ameritrade, Inc.*,
   337 F. Supp. 3d 1227 (S.D. Fla. 2018) ...............................................................13

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ..............................................................................................9

*McCoy v. Goldberg*,
   748 F. Supp. 146 (S.D.N.Y. 1990) .....................................................................20

*Merrill Lynch Futures Inc. v. Kelly*,
   585 F. Supp. 1245 (S.D.N.Y. 1984) ...................................................................11

*MMC Corp. v. Comm'r of Internal Revenue*,
   551 F.3d 1218 (10th Cir. 2009) .............................................................................3

*R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*,
   205 F.3d 165 (5th Cir. 2000) .............................................................................9, 10

*Rodgers-King v. Candy Digital Inc.*,
   No. 23-cv-2591 (RA), 2024 WL 382092 (S.D.N.Y. Feb. 1, 2024) ......................11

*S.E.C. v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)..................................................................................15

*Saxe v. E.F. Hutton & Co.,*
    789 F.2d 105 (2d Cir. 1986)..............................................................................................16

*SEC v. Mapp,*
    240 F. Supp. 3d 569 (E.D. Tex. 2017)..................................................................................8

*Tatum v. Legg Mason Wood Walker, Inc.,*
    83 F.3d 121 (5th Cir. 1996) ................................................................................................6

*Tatum v. Smith,*
    887 F. Supp. 918 (N.D. Miss. 1995)....................................................................................6

*Trammo, Inc. v. Smothermon,*
    1:22-cv-04446 (S.D.N.Y.) ............................................................................................2, 19

*United States v. Smothermon,*
    1:19-cr-00382-AKH (S.D.N.Y.) ..........................................................................................1

*Vekaria v. Mthree Corp. Consulting, Ltd.,*
    No. 22 Civ. 3197 (JPC), 2024 WL 4337542 (S.D.N.Y. Sept. 27, 2024)................................16

*Vetter v. Shearson Hayden Stone Inc.,*
    481 F. Supp. 64 (S.D.N.Y. 1979) ......................................................................................19

*Wu v. Bitfloor, Inc.,*
    460 F. Supp. 3d 418 (S.D.N.Y. 2020)..................................................................................4

**Statutes**

7 U.S.C. § 1a.............................................................................................................17, 18

7 U.S.C. § 6b..............................................................................................................3, 5

7 U.S.C. § 6d(a) ...........................................................................................................17

7 U.S.C. § 6m(1)..........................................................................................................17

7 U.S.C. § 9(1) .......................................................................................................*passim*

15 U.S.C. § 78m...........................................................................................................19

15 U.S.C. § 78o(d) ........................................................................................................19

18 U.S.C. § 1343.......................................................................................................1, 14

CEA Section 4b.......................................................................................................*passim*

CEA Section 4*o*..................................................................................................................6

CEA Section 6.......................................................................................................... *passim*

**Other Authorities**

17 C.F.R. § 1.10 ..........................................................................................................13, 18

17 C.F.R. § 1.12 ...............................................................................................................18

17 C.F.R. § 1.17 ...............................................................................................................18

17 C.F.R. § 1.31(a)–(b).....................................................................................................12

17 C.F.R. § 1.55 ...............................................................................................................18

17 C.F.R. § 23.105 ...........................................................................................................18

17 C.F.R. § 180.1 ..................................................................................................... *passim*

17 C.F.R. § 240.13a-1 ......................................................................................................19

155 Cong. Rec. S9556 (Sept. 17, 2009)............................................................................8

156 Cong. Rec. S3347 (May 6, 2010) ...............................................................................8

76 Fed. Reg. 41398 (July 14, 2011)....................................................................... *passim*

85 Fed. Reg. 57462 (Sept. 15, 2020) ..............................................................................18

Fed. R. Evid. 201 ...............................................................................................................2

To Consider the Reauthorization of the Commodity Futures Trading Commission:
    Hearing Before the S. Comm. on Agric., Nutrition, and Forestry, 109th Cong.
    12–13 (2005)................................................................................................................6

Rule 9(b) ................................................................................................................. *passim*

SEC Rule 10b-5 .......................................................................................................7, 11, 14

Federal Rule of Civil Procedure 12(b)(6) .........................................................................4

CME Group Rulebook, Joint NYMEX & COMEX, Rule 573,
    https://www.cmegroup.com/rulebook/NYMEX/1/5.pdf (last visited Apr. 7,
    2026) ..........................................................................................................................14

CME Group Rulebook, Joint NYMEX & COMEX, Rules 813–14,
    https://www.cmegroup.com/rulebook/NYMEX/1/8.pdf (last visited Apr. 7,
    2026) .....................................................................................................................13, 16

CME Group Rulebook, Joint NYMEX & COMEX, Rules 588.A, 588.C, https://www.cmegroup.com/rulebook/NYMEX/1/5.pdf (last visited Apr. 7, 2026) .................................................................................................................14

S. Rep. No. 109-119 (July 29, 2005) ..............................................................................6

Trammo, Inc., *Ownership*, https://www.trammo.com/ownership (last visited Apr. 6, 2026) ...........................................................................................................19

**PRELIMINARY STATEMENT**

The Commodity Exchange Act (CEA) polices market integrity, not private wrongs that happen to touch the commodities markets. The Commodity Futures Trading Commission's (the "Commission" or "CFTC") Complaint alleges that Defendant David Smothermon, while serving as the president of a private trading company's Gas Division, made deceptive entries in the Company's internal T&T System to conceal trading losses from his employer. While Mr. Smothermon pleaded guilty to federal wire fraud for this conduct, those allegations sit outside the limited scope of the CEA.[1] *See United States v. Smothermon*, 1:19-cr-00382-AKH (S.D.N.Y.), ECF No. 152 (Judgement in a Criminal Case). Congress intended the CEA to do something different and more limited than generally preventing fraud; instead, Congress charged the CFTC with protecting the integrity of public commodities markets more narrowly. Extending the CEA's civil enforcement authority to back-office record-keeping—where the only victim was the defendant's own employer—would transform the Commission into a general fraud regulator contrary to Congress's intent as expressed in the CEA's plain language. Because the CEA polices market integrity—not private corporate recordkeeping—the Commission fails to state a claim for at least the two following reasons:

- **The alleged conduct lacks the requisite "connection" to a regulated transaction**. The Commission's anti-fraud authority is limited to conduct affecting market integrity or the price discovery process. The alleged "mismarking" occurred exclusively within a closed internal T&T System after the relevant transactions had already been executed. The Commission's attempt to regulate these internal entries exceeds its statutory mandate.

- **The Commission fails to plead transaction or loss causation**. To establish fraud under Section 6 of the CEA and CFTC Rule 180.1, the Commission must allege that the deceptive conduct actually induced a transaction. Here, any alleged internal

---

[1] Although Mr. Smothermon pleaded guilty to wire fraud in the separate criminal matter, that plea is limited to the elements of 18 U.S.C. § 1343 and does not constitute an admission of the CFTC's civil claims or factual characterizations.

1

T&T System entries made after a trade is finalized cannot serve as the "but for" cause of the Company's decision to enter that trade. Absent any allegation of inducement, the Commission's theory of causation fails to state a claim.

In sum, the T&T System was a private internal recordkeeping tool. The Commission does not allege that the Company shared this information with any clearing member, broker, dealer, or other market participant. Because these entries remained sequestered within the Company, they could not have influenced the broader market or the "connection" between participants necessary to trigger the CEA.

Even if the Complaint were not dismissed for the foregoing reasons, it still woefully fails to satisfy the heightened pleading requirements of Rule 9(b). Rule 9(b) requires the Commission identify the specific "who, what, where, when, and how" of allegedly fraudulent conduct to survive a motion to dismiss. This Complaint relies on generalized damages aggregates and broad timeframes, failing to provide the specific details regarding entries and communications required to survive a motion to dismiss.

**BACKGROUND**[2]

**I.   The Commission's allegations relate solely to internal recordkeeping and internal corporate affairs rather than market-facing conduct.**

This action arises from the CFTC's allegations of "mismarking" against Defendant David Smothermon. During the "Relevant Period" of December 2015 through September 1, 2016, Mr. Smothermon served as the president and head trader of the Gas Division of a large, privately-held commodities-trading company (the "Company").[3] ECF Docket No. 1, Complaint ¶¶ 1, 13. The

---

[2]   Defendant cites or restates the allegations from the CFTC's Complaint for Rule 12(b) purposes only, without admitting the truth or accuracy of the matters alleged within.

[3]   While not alleged in the Complaint, the Court can take judicial notice that the Company is Trammo, Inc. Fed. R. Evid. 201; *see Trammo, Inc. v. Smothermon*, 1:22-cv-04446, ECF No. 1 (S.D.N.Y.).

CFTC alleges that Mr. Smothermon caused "false or misleading entries" to be made in the Company's internal trading and traffic recordkeeping system (the "T&T System"). *Id.* ¶¶ 1, 4. Specifically, the Complaint asserts that Mr. Smothermon directed the manual entry of mark-to-market valuations[4] for New York Mercantile Exchange ("NYMEX") natural gas futures and certain physical natural gas trades. *Id.* ¶¶ 2–3. The Commission contends these entries were "deceptively exaggerated" to inflate the reported profit-and-loss value of the Gas Division's trading book and concealed approximately $100 million in realized trading losses from the Company. *Id.* ¶¶ 2, 6, 87. The Complaint provides some examples of alleged mismarking in late 2016, claiming that valuations for ethane, propane, and butane futures deviated from NYMEX daily settlement marks or the marks of the Company's futures commission merchant. *Id.* ¶¶ 40, 49, 51, 54. Additionally, the CFTC points to several instances in August 2016 where Mr. Smothermon allegedly directed administrative employees to change price and quantity entries for physical propane trades in the T&T System. *Id.* ¶¶ 65, 67, 69, 72, 74.

**II.     The Commission's Causes of Action**

Based on these internal recordkeeping allegations, the Commission asserts two counts against Mr. Smothermon:

- **Count I**: Fraud by manipulative or deceptive device or contrivance in violation of Section 6(c)(1) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 9(1), and Commission Regulation 180.1(a).

- **Count II**: Fraud in connection with futures contracts in violation of Section 4b(a)(1)(A)-(C) of the CEA, 7 U.S.C. § 6b(a)(1)(A)–(C).

---

4       Mark-to-market valuation is an accounting method that records the value of assets, liabilities, or securities based on their current market price rather than their historical cost. *See MMC Corp. v. Comm'r of Internal Revenue*, 551 F.3d 1218, 1219 (10th Cir. 2009) (citing 26 U.S.C. § 475(a)(2)(A)).

The CFTC seeks permanent injunctive relief, civil monetary penalties, and remedial ancillary relief, including trading bans and restitution.

## STANDARDS OF REVIEW

### I.    Rule 12(b)(6) – Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A claim achieves facial plausibility only when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court is not required to accept conclusory statements, unwarranted factual inferences, or legal conclusions as true. *Id.* at 678–79. Dismissal is appropriate where there is a lack of a cognizable legal theory or an absence of sufficient facts to support the elements of the alleged cause of action.

### II.   Rule 9(b) – Heightened Pleading for Fraud

Because the Commission's claims under CEA Sections 6(c)(1) and 4b(a) are grounded in allegations of fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007) ("Accordingly, a [SEC Rule 10b] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."); *Bartels v. Clayton Brokerage Co. of St. Louis, Inc.*, 631 F. Supp. 442, 450 (S.D.N.Y. 1986) (Rule 9 applies to CEA claims). To satisfy Rule 9(b), the Commission must state "with particularity" the circumstances constituting fraud. This requires the Complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wu v. Bitfloor, Inc.*, 460 F. Supp. 3d

4

418, 423 (S.D.N.Y. 2020) (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)); *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462–63 (2d Cir. 2019) (securities fraud claims under the Private Securities Litigation Reform Act and Rule 9(b) requires the plaintiff to "specify the statements that the plaintiff contends were fraudulent," "identify the speaker," state "where and when the statements were made," and "explain why the statements were fraudulent").

## ARGUMENT

**I.      The CFTC's anti-fraud authority encompasses market fraud, not internal corporate recordkeeping.**

The CFTC's anti-fraud authority over the United States commodities and derivatives markets is established within the Commodity Exchange Act (CEA). While the CFTC's anti-fraud authority expanded under the Dodd-Frank Wall Street Reform and Consumer Protection Act, its power remains anchored to the protection of market integrity rather than the policing of internal corporate affairs.

*First*, the traditional anti-fraud authority found in CEA Section 4b, codified at 7 U.S.C. § 6b, makes it unlawful

> for any person**, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made**, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for . . . the other person . . . .

7 U.S.C. § 6b(a)(1) (emphasis added). Section 4b is historically rooted in the protection of the principal-agent relationship. *See Merrill Lynch Futures Inc. v. Kelly*, 585 F. Supp. 1245, 1251

(S.D.N.Y. 1984) (observing that Section 4b "applies only to persons making contracts 'on behalf of other persons'" and that the statute's "primary focus . . . is on fraud practiced by brokers on their customers"); *Tatum v. Smith*, 887 F. Supp. 918, 921–22 (N.D. Miss. 1995), aff'd sub nom. *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121 (5th Cir. 1996) (dismissing claims where the fraud was not "in connection with" an order made "for or on behalf of" the plaintiffs, despite the fact that the defendant used the embezzled funds to cover his own separate trading losses); *Kearney v. Prudential-Bache Sec., Inc.*, 701 F. Supp. 416, 422–24 (S.D.N.Y. 1988) (explaining that Section 4b's language "reflects an apparent Congressional intent to cover only losses that result from a commodities transaction" and declining to read the provision as broadly as statutes governing advisors who are not involved in the making of contracts (*i.e.*, § 4*o* of the CEA)).

Section 4b thus reflects a clear Congressional intent to cover only losses resulting from a commodities order or transaction, not ancillary misconduct. *Kearney*, 701 F. Supp. at 422–24; *see also To Consider the Reauthorization of the Commodity Futures Trading Commission*: Hearing Before the S. Comm. on Agric., Nutrition, and Forestry, 109th Cong. 12–13 (2005) (During a discussion with Senator Tom Harkin, Acting CFTC Chairman Sharon Brown-Hruska noted that Section 4b's fraud authority applied primarily to intermediated transactions (*i.e.*, broker-customer relationships)); S. Rep. No. 109-119, at 2, 10 (July 29, 2005) (noting the CFTC's primary charge is protecting market users and the public from fraud in futures markets and that the Commodity Exchange Reauthorization Act of 2005's clarification of authority regarding certain transactions would not have a "major impact on this already regulated marketplace").

*Second*, the Commission's authority under both the traditional broker-fraud provisions of Section 4b and the newer Section 6(c)(1) stops at the edge of the public marketplace. Following the enactment of the Dodd-Frank Act, the CFTC's anti-fraud and anti-manipulation authority was

6

augmented by CEA Section 6(c)(1), codified at 7 U.S.C. § 9(1). Rule 180.1, codified at 17 C.F.R. § 180.1(a)(1)–(3), is the CFTC's interpretation of its statutory authority under CEA Section 6(c)(1). Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398, 41399 (July 14, 2011) (providing that Rule 180.1 codifies the CEA's prohibition of deceptive contrivances in connection with swaps or interstate commodity sales). CEA Section 6(c), which was modeled after Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, makes it unlawful for

> any person, directly or indirectly, to use or employ, or attempt to use or employ, **in connection with** any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010 [, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

7 U.S.C. § 9(1) (emphasis added). Rule 180.1(a), in turn, makes it unlawful

> for any person, directly or indirectly, **in connection with** any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. 180.1(a) (emphasis added).

While Section 6(c) expanded the CFTC's anti-fraud reach beyond the broker-customer relationship to a market-wide standard, it did not grant the Commission the power to police all fraud that happens to "touch" the commodities futures market. The legislative history confirms that Section 6(c) was designed to protect the public price discovery process. Senator Maria

7

Cantwell, the principal author of the CEA's anti-manipulation amendments, emphasized that the law's purpose was to provide regulators the power to fight market manipulation and restore accountability to the financial markets. 156 Cong. Rec. S3347, S3348 (May 6, 2010). The record is replete with focus on market-facing abuses—such as corners, squeezes, and price distortions— that disrupt market functioning. 155 Cong. Rec. S9556, S9557 (Sept. 17, 2009) (explaining that the legislation targets "bad-actors" who manipulate commodity prices—such as oil, gasoline, and food—and is intended to catch only those who "attempt to affect the market or prices by artificial means" rather than natural market forces); 156 Cong. Rec. S3347, S3348–49 (May 6, 2010) (emphasizing that the amendment is designed to protect "the integrity of markets" for those who rely on them for business and to provide a "versatile standard" to combat "evolving forms of manipulative trading schemes"). For example, the CFTC's adopting release provided that Rule 180.1 was specifically designed to "promote the integrity of the markets, and protect market participants" by implementing a "comprehensive new regulatory framework." 76 Fed. Reg. at 41398. The CFTC, citing Senator Carl Levin, emphasized that this authority is centered on the health of the broader marketplace. *Id.* at 41400 (citing Senator Carl Levin's belief that the CFTC and SEC should "harmonize [its] regulatory structures for combating disruptive and manipulative activities").

Together, these provisions delineate a boundary: federal civil enforcement targets deceptive market conduct, not internal corporate affairs or breaches of fiduciary duty that remain confined to a company's internal records and which are already governed by a robust and well-developed body of civil and criminal law.[5]

---

[5] While the CEA is often labeled a remedial statute, the rule of lenity requires that statutory ambiguities be resolved in favor of the defendant when the government seeks significant punitive sanctions. Lenity applies in civil enforcement where part of the underlying statutory scheme—as seen in 7 U.S.C. § 13—carries criminal applications. *See SEC v. Mapp*, 240 F. Supp. 3d 569, 582 (E.D. Tex. 2017); *Bittner v. United States*, 598 U.S. 85, 101–03 (2023) (holding that

8

**II.    The Commission has failed to plausibly allege deceptive conduct "in connection with" a regulated transaction.**

    **A.    Post-trade T&T System entries intended to conceal losses from an employer lack the requisite connection to a regulated transaction.**

While the Commission's authority under CEA Sections 4b(a), 6(c)(1) and Rule 180.1 is broad, as the Commission itself has acknowledged, its elasticity is "not limitless." 76 Fed. Reg. at 41405. Furthermore, under the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412–13 (2024), this Court is now required to exercise its independent judgment in deciding whether the Commission has acted within its statutory authority. The Commission's attempt to stretch the "in connection with" requirement to reach post-execution entries into an internal trading and traffic recordkeeping system fails this independent assessment.

To fall within the ambit of any of CEA Sections 4b(a), 6(c)(1), and 17 C.F.R. § 180.1, a deceptive device must be employed "in connection with" a swap or a contract of sale of a commodity in interstate commerce. This requirement establishes a substantive limit that focuses the Commission's authority on public market oversight rather than internal corporate governance. *See Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 101–02 (2d Cir. 2000) (holding that fraudulent misrepresentations regarding a computer program's function and profitability were made "in connection with" futures transactions because the software's sole purpose was to direct specific trades, creating an "intended and direct link" between the advertisements and the suggested currency trading); *R&W Tech. Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 172 (5th Cir. 2000) ("In order for a fraudulent statement to be 'in connection with' a commodities future contract as required by § 4b(a), the statement must first misrepresent the

---

"statutes imposing penalties are to be construed strictly against the government"). Consequently, to the extent the Court believes the "in connection with" requirement for the relevant CEA provisions is ambiguous, any such ambiguities must be resolved in favor of the Defendant.

fundamental risk associated with such investments. . . . the plain language of § 4b(a) requires the misrepresentation to have some connection with the trading of commodity futures contracts.").

The Commission's claims under both Count I and Count II founder on the "in connection with" requirement. At its core, the Commission alleges that Mr. Smothermon caused "false or misleading entries in the Company's internal trading and traffic recordkeeping system"—the "T&T System." Compl. ¶ 1; *see id.* ¶¶ 4, 65, 67, 69, 72, 74. The stated purpose of this conduct was to "conceal from the Company" various trading losses and to "inflate the value of the trading book he oversaw." *Id.* ¶ 1.

These allegations do not state a CEA fraud claim. As a comparison, in *R&W Tech. Services Ltd.*, the court held that fraudulent advertisements for trading software met the "in connection with" requirement because the "primary purpose of purchasing the advice [was] to execute trades." 205 F.3d at 172–73. The court approvingly cited the CFTC's determination that the "gravamen of the claim" was that the defendants misled potential purchasers "in order to induce customers to trade." 205 F.3d at 173. In stark contrast, the Complaint here does not allege that Mr. Smothermon's internal T&T System entries induced a single trade or influenced any external market participant. While the *R&W* defendants' fraud was market-facing and designed to solicit investment, the allegations against Mr. Smothermon involve **post-trade** internal recordkeeping allegedly intended only to "conceal from the Company" its own trading losses. *See* Compl. ¶¶ 1, 4, 41. In other words, the alleged victim is Mr. Smothermon's former employer, and the alleged "device" is a series of entries in the Company's private, internal database.

> **B.    Any alleged T&T System adjustments would not have impacted public investors.**
>
> > **1.    The Commission's focus on internal recordkeeping represents a fundamental departure from the CEA's "in connection with" requirement.**

10

Rule 180.1 is modeled after Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5; accordingly, courts often look to judicial interpretations of the securities laws to define the "in connection with" boundary. *Kearney*, 701 F. Supp. at 421; *see* 76 Fed. Reg. at 41399, 41401 (providing that CFTC was guided by the "substantial body of judicial precedent" applying those securities laws to ensure commodities market integrity). As the Supreme Court clarified in *SEC v. Zandford*—a case which the CFTC also cited as an example of the limits of the "in connection with" requirement, 76 Fed. Reg. at 41405—while the CEA's anti-fraud provisions should be construed flexibly to effectuate its remedial purposes, it must not be "construed so broadly as to convert every common-law fraud . . . into a violation of those provisions." 535 U.S. 813, 820 (2002). The *Zandford* Court specifically cautioned that a breach of fiduciary duty or even a scheme to steal assets only enters the federal regulatory sphere when that fraud "coincides" with the *actual* securities transaction. *Id.* at 822. For example, a broker who merely "embezzles cash from a client's account" or uses a fiduciary relationship to trick a client into a "fraudulent real estate transaction" falls outside the federal regulatory sphere because the fraud does not include the "requisite connection" to a securities trade. *Id.* at 825 n.4.

In the Second Circuit, this requires that the alleged misconduct "touch upon" the investment's characteristics or the decision to invest. *In re Carter–Wallace, Inc. Secs. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (the phrase "in connection with" is designed to capture deceptive devices that are "of a sort that would cause reasonable investors to rely thereon"). The misconduct must be "of a sort that would cause reasonable investors to rely thereon." *Id*. (citing *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 859–60 (2d Cir. 1968)); *Rodgers-King v. Candy Digital Inc.*, No. 23-cv-2591 (RA), 2024 WL 382092, at *3–5 (S.D.N.Y. Feb. 1, 2024) (granting motion to dismiss because alleged misrepresentations regarding a plaintiff's job role and resources were "not made

11

in connection with the sale of securities" and did not concern the "characteristics or attributes that would induce an investor to buy or sell" the stock options offered in an employment package). Here, the alleged "mismarking" of the T&T System did not induce any trade, deceive any counterparty, or affect price discovery.

Indeed, the Commission's own rulemaking acknowledges these limits. In adopting Rule 180.1, the Commission stated it would be guided by the example in *Zandford* regarding a broker who "induce[s] his client into a fraudulent real estate transaction" or "embezzles cash from a client's account." 76 Fed. Reg. at 41405–06. In those instances, the Commission noted, the fraud "would not include the requisite connection to a purchase or sale" because it lacks a relationship to market integrity. *Id.* at 41406.

The same logic applies with equal force here. The alleged "mismarking" of the T&T System is a matter of internal corporate affairs—not a deceptive device used "in connection" with the commodity markets. To hold otherwise would transform the CFTC into a federal overseer of every internal spreadsheet in the commodities industry, a result that "respects [neither] the jurisdiction that Congress conferred upon the Commission" nor the "core mission" of the Act. *Id.* at 41401; 7 U.S.C. § 5 (stating the Act's purpose is to protect the "national public interest" by "deter[ring] and prevent[ing] price manipulation," ensuring "market integrity" and "financial integrity," and protecting participants from "fraudulent or other abusive sales practices," all through the oversight of "trading facilities, clearing systems, market participants and market professionals"). Unlike CFTC registrants, who must adhere to rigorous bookkeeping and public reporting requirements designed to safeguard market transparency, Mr. Smothermon and his employer were private actors whose internal recordkeeping was entirely isolated from the public derivatives market. *Compare* 17 C.F.R. § 1.31(a)–(b) (mandating that CFTC registrants keep full,

12

complete, and systematic records of all transactions relating to their business of dealing in commodity interests) *and* 17 C.F.R. § 1.10 (requiring registrants to file detailed periodic financial reports with the Commission), *with* Compl. ¶ 13 (conceding Smothermon has never been registered with the Commission) *and infra* n. 6 (noting that at all relevant times the Company was a private entity with no public disclosure obligations).

### 2.    Internal T&T System entries cannot alter the economic terms of transactions dictated by the exchange.

The alleged fraud is fundamentally disconnected from any regulated transaction by the mandatory mechanics of the exchange. Because NYMEX requires daily margin and settlement payments based on its own official marks, the Company's financial reality was dictated by the exchange—not by Mr. Smothermon's internal T&T System entries. These alleged entries did not, and could not, alter the economic terms of any trade. Here, the alleged fraud did not coincide with the execution of any market-facing trade; it purportedly occurred only after the actual transaction was executed on the exchange, and within the closed ecosystem of the Company's T&T System.

Notably, the CFTC does not allege that internal entries occurring within the Company's T&T System resulted in any alteration to the economics of the transactions, including for exchange-mandated payments made throughout the trade lifecyle. Nor could they. As a NYMEX market participant (*see* Compl. ¶¶ 2, 36–54), Mr. Smothermon's employer was required to make (and receive) daily margin payments, settling its positions with the exchange through its broker or clearing member on a daily basis, as measured against the exchange's daily settlement marks. *See* CME Group Rulebook, Joint NYMEX & COMEX Rules 813–14, https://www.cmegroup.com/rulebook/NYMEX/1/8.pdf (last visited Apr. 7, 2026) (requiring daily "settlement variation" payments based on the official daily settlement price). Price, quantity, underlying commodity, and other material terms are electronically submitted to the exchange via

13

Globex, meaning that the market participant's transaction terms must "match" with a market-maker on the exchange. *See* CME Group Rulebook, Joint NYMEX & COMEX Rule 573, https://www.cmegroup.com/rulebook/NYMEX/1/5.pdf (last visited Apr. 7, 2026). Indeed, the exchange maintains exclusive authority to ensure price integrity and may even cancel or adjust trades that fall outside of the market's "no-bust" range. CME Group Rulebook, Joint NYMEX & COMEX Rules 588.A, 588.C, https://www.cmegroup.com/rulebook/NYMEX/1/5.pdf (last visited Apr. 7, 2026). Consequently, internal trading and traffic recordkeeping system entries cannot create a situation where a market participant's position reflects inaccurate trade terms or creates a secret economic impact on the participant's financial standing.

The CFTC does not allege that Mr. Smothermon deceived a counterparty to a swap or futures contract, nor that he injected false information into the broader marketplace to affect price discovery. At most, the Complaint describes a matter of internal corporate wrongdoing.  While such conduct may give rise to a claim for common-law fraud, breach of fiduciary duty, or a breach of employment contract and may constitute violation of another federal statute such as the wire-fraud statute, 18 U.S.C. § 1343, it lacks the requisite connection to a regulated transaction demanded by the CEA. Indeed, the Complaint does not allege that Plaintiff's fraud involved any solicitation or even induced any of the alleged trades as the alleged misconduct is limited to a mismarking of the Company's T&T System after the trades were already executed.

> **C.    The Commission's claims must be dismissed because the Complaint fails to plausibly allege either transaction or loss causation as required by Section 6(c)(1) of the CEA and Rule 180.1.**

Even under a flexible interpretation of the "in connection with" requirement, the Commission must plausibly allege causation. Because CFTC Rule 180.1 is modeled after Section 10(b) and SEC Rule 10b-5, the "in connection with" element requires a showing of both transaction causation and loss causation. *Krukever v. TD Ameritrade, Inc.*, 337 F. Supp. 3d 1227, 1239 (S.D.

14

Fla. 2018) ("A plaintiff alleging fraud under the CEA must prove both 'transaction causation' and 'loss causation.'"); *see S.E.C. v. Lee*, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010) (observing that in interpreting the "in connection with" requirement of the CEA, courts generally look to Section 10(b) of the Securities Exchange Act, which requires a plaintiff to allege both transaction and loss causation).

Transaction causation requires a showing that "but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction," while loss causation requires that the fraud "was the cause of the actual loss suffered." *Lee*, 720 F. Supp. 2d at 338.

*First*, the Complaint does not allege that Mr. Smothermon's internal entries in the T&T System induced the Company to enter into any specific swap or futures contract. On the contrary, the Commission admits the alleged misconduct involved "mismarking" positions that had already been executed. *See* Compl. ¶¶ 39–40; *id.* ¶ 65 ("[O]r around August 1, 2016, Smothermon caused changes in the T&T System relating to the terms of a physical trade that had been previously executed and entered into the T&T System in or around July 2016."), *id.* ¶ 72 ("[O]n or Around August 1, 2016, Smothermon caused changes in the T&T System relating to terms of a physical trade that previously had been executed and entered into the T&T System in or around November 2015").

The Commission's theory fails a basic test of chronology. Under the transaction loss rule, the deceptive act must induce the transaction. But here, the Commission admits the entries were made after the trades were finalized. A post-trade ledger entry cannot be the "but-for" cause of a decision that has already been made. *See Carter–Wallace, Inc. Secs. Litig.*, 150 F.3d at 156 (explaining that the "in connection with" requirement is satisfied only where the device employed is "of a sort that would cause reasonable investors to rely thereon" and applying a "straightforward

15

cause and effect" test to determine if the deceptive conduct actually resulted in the trading activity); *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 108–09 (2d Cir. 1986) (affirming dismissal of a Rule 10b-5 claim because the investor decided to sell his stocks to move into commodities before any alleged fraud occurred); *Vekaria v. Mthree Corp. Consulting, Ltd.*, No. 22 Civ. 3197 (JPC), 2024 WL 4337542, at *11–12 (S.D.N.Y. Sept. 27, 2024) (holding that the "in connection with" requirement was not satisfied where the alleged fraud "had nothing to do with any particular security but related only to defendants' intention not to comply with the agreement" to transfer promised shares).

*Second*, the T&T System entries cannot satisfy the "loss causation" prong because the Company's actual financial standing was governed by objective, external exchange marks rather than internal entries. Regardless of the alleged mismarking in the T&T System, as a NYMEX market participant, the Company's financial losses were dictated by its obligations as a NYMEX market participant to satisfy daily margin and settlement variation payments. *See* CME Group Rulebook, Joint NYMEX & COMEX Rules 813–14, https://www.cmegroup.com/rulebook/NYMEX/1/8.pdf (last visited Apr. 7, 2026) (requiring daily "settlement variation" payments based on the official daily settlement price); *see* Compl. ¶ 38 (alleging that the "true" market values were readily available through broker quotations and the Company's own futures commission merchant). Critically, these daily margin calls and settlement payments are processed through the Company's futures commission merchant (FCM) and clearing members (*see id.*), creating a transparent, external audit trail of the Company's actual financial standing tied exclusively to the exchange's official marks. Because the "true" market values and actual cash flows were determined by these transparent, external audit trails, the Company was at all times in possession of the "true" mark-to-market value of its positions. The alleged loss did not

16

stem from a fraud "in connection with" a commodity transaction but was a function of the market's movement and the exchange's official settlement prices—not the internal T&T System entries.

To allow the CFTC to proceed on these allegations would transform an internal fraud, employment, or fiduciary dispute into a federal market fraud case. *See Zandford*, 535 U.S. at 820 (cautioning against converting common-law fraud or breaches of fiduciary duty into federal violations).

Accordingly, because the actual loss-triggering payments were decoupled from Mr. Smothermon's alleged internal T&T System entries, the Commission has failed to allege that the "mismarking" was the cause of the actual loss suffered.

### D. Smothermon and the Company were not subject to CFTC registration and thus owed no reporting or disclosure obligations that could have influenced the commodities market.

The CEA does not impose a generalized duty of public disclosure upon all market participants. Instead, the Act's registration and reporting mandates are strictly tethered to specific, defined categories of professionals. Under this statutory scheme, registration is required only for a certain set of persons, such as futures commission merchants (7 U.S.C. § 6d(a)), introducing brokers (*id.* § 6d(g)), commodity trading advisors (CTAs) and commodity pool operators (*id.* § 6m(1)), and swap dealers (*id.* § 6s(1)–(2)). Each role is precisely defined by the CEA, and the resulting disclosure obligations extend only to those functioning in these explicit capacities. *See id.* §§ 1a(11) (defining "commodity pool operator"), 1a(12) (defining "commodity trading advisor"), 1a(28) (defining "future commission merchant"), 1a(31) (defining "introducing broker"), 1a(33) (defining "major swap participant"), 1a(49) (defining "swap dealer"). By way of further illustration, CFTC registrants like swap dealers, introducing brokers, futures commission merchant**s**, and others are subject to ongoing regulatory capital and financial reporting and public disclosure obligations, which are intended to inform the public as to the financial standing of an

17

entity with whom they would do business. *See* 17 C.F.R. § 23.105 (requiring swap dealers and major swap participants to file monthly and audited annual financial reports, and to make certain financial condition and regulatory capital information publicly available on their websites); *see also id.* § 1.10 (financial reporting requirements for Futures Commission Merchants and Introducing Brokers); *id.* §§ 1.12, 1.17 (establishes the minimum financial requirements for futures commission merchants and introducing brokers and notification procedures for FCMs and IBs when capital falls below certain levels); *id.* § 1.55(k) (requires FCMs to provide certain financial disclosures to the public on their websites). For example, a swap dealer must complete an annual audit and publicly disclose its results on its webpage. *Id.* §§ 23.105(e), (i). The CFTC promulgated this rule because public disclosure of a swap dealer's financial condition facilitates informed decision-making by market participants regarding the creditworthiness of the entity and supplies market participants with information to allow them to better understand the financial health of their counterparties. Capital Requirements for Swap Dealers and Major Swap Participants, 85 Fed. Reg. 57462, 57538 (Sept. 15, 2020).

Smothermon and the Company fall entirely outside these categories. Indeed, the Complaint concedes that "Smothermon has never been registered with the Commission in any capacity." Compl. ¶ 13. The Complaint makes no allegation that Smothermon was required to register with the Commission at any point during the alleged misconduct. Even where the Complaint implicitly suggests CTA-like activity, it fails to allege conduct subject to registration; Congress specifically excluded advisors who do not hold themselves out to the public or who have provided advice to fewer than fifteen persons within twelve months. 7 U.S.C. § 6m(1); *see also id.* § 1a(12)(B) (further excluding banks, lawyers, and accountants).

18

Because they were not "registrants," neither Smothermon nor the Company was obligated to file financial reports with the CFTC or make the public disclosures required of registered persons. Consequently, Smothermon's alleged entries in the Company's internal T&T System remained private. This lack of a registration-based reporting duty further underscores that such internal entries could not have reached, let alone swayed, the broader commodities markets, trading counterparts, or external investors.[6]

### III.    The Complaint fails Rule 9(b) by substituting a few isolated examples for the particularity required to plead an alleged nine-month fraudulent scheme.

The Complaint does not sufficiently plead fraud. Federal Rule of Civil Procedure 9(b) requires that in all averments of fraud, the circumstances constituting the fraud must be stated "with particularity." Fed. R. Civ. P. 9(b). This standard necessitates pleading the "who, what, where, when, and how" of the alleged misconduct to provide the defendant with fair notice. *Supra* at 10–11; *Vetter v. Shearson Hayden Stone Inc.*, 481 F. Supp. 64, 65–66 (S.D.N.Y. 1979) (finding that the complaint failed to satisfy Rule 9(b) because it did "no more than make unsubstantiated conclusory allegations" of an "improper course of conduct" rather than identifying specific transactions).

The Complaint here fails the heightened requirements of Rule 9(b) because it substitutes generalities for particulars. It alleges fraud "by telephone and e-mail" (Compl. ¶ 57) without identifying a single date, recipient, or specific statement. It alleges $100 million (*id.* ¶¶ 6, 81, 87)

---

[6] At all relevant times, Trammo was a private company and not an SEC filer. *See* Trammo, Inc., *Ownership*, https://www.trammo.com/ownership (last visited Apr. 7, 2026) ("Trammo remains a privately held company owned by trusts established by the Estate of Ronald P. Stanton and Oliver K. Stanton."); *Trammo, Inc. v. Smothermon*, 1:22-cv-04446, ECF No. 2 (S.D.N.Y.) ("[P]laintiff Trammo, Inc. ("Trammo") certifies that Trammo is a privately held corporation and there is no publicly held corporation that owns 10% or more of its stock."). *See, e.g.*, 15 U.S.C. § 78m (requiring companies with registered publicly held securities to make periodic disclosures); 15 U.S.C. § 78o(d) (extends periodic reporting requirements to companies that have filed a registration statement under the Securities Act of 1933 (*e.g.*, through an IPO) even if their securities are not listed on a national exchange); 17 C.F.R. § 240.13a-1 (requiring public issuers to file annual reports).

19

in losses but fails to identify which specific manual entries were false or what the "true" market value was at the moment of entry. While the Complaint identifies a few discrete instances of "mismarked" futures contracts (*id.* ¶ 40) and further "mismarking" in August 2016 (*id.* ¶¶ 48–52; 65–76), these isolated "examples" do not provide the complete "who, what, where, and when" for the vast majority of the alleged nine-month scheme.

Beyond these examples, the Commission relies on broad timeframes—dating back to "December 2015" through "September 1, 2016" (*id.* ¶ 1)—and generalized aggregates in "overstatements," such as "more than $50 million" (*id.* ¶ 45), "$32 million" (*id.* ¶ 49), "$35 million" (*id.* ¶ 52), and "$12 million" (*id.* ¶ 55). The Complaint fails to identify the specific manual entries, the exact dates they occurred, or the "true" market values Mr. Smothermon allegedly disregarded at the time of each entry. Under Rule 9(b), a defendant is entitled to know the specific circumstances of the fraud alleged against him, not just a representative sample of a larger loss. *See McCoy v. Goldberg*, 748 F. Supp. 146, 154–55 (S.D.N.Y. 1990) (while a plaintiff is not required to "recite detailed evidentiary matter" at the pleading stage, "summary allegations will not suffice" to satisfy the particularity requirements of Rule 9(b)); *Gamm*, 944 F.3d at 462–63 (requiring a plaintiff to "identify the speaker," state "where and when" statements occurred, and "explain why" they were fraudulent).

## CONCLUSION

For the reasons stated above, the Court should dismiss the claims against Defendant with prejudice and grant such other relief as the Court deems just and proper.

20

Dated: April 7, 2026                                            Respectfully,
        New York, NY

By:  /s/ *Drew C. Harris*
       Drew C. Harris
       STEPTOE LLP
       1114 Avenue of the Americas
       New York, NY 10036
       Phone: (212) 378-7532
       Email: dcharris@steptoe.com

       David Isaak (*pro hac vice*)
       STEPTOE LLP
       717 Texas Avenue, Suite 2800
       Houston, Texas 77002
       Phone: (713) 221-2300
       Email: disaak@steptoe.com

21

**CERTIFICATE OF COMPLIANCE**

This memorandum of law complies with the word-count limitations of Local Civil Rule 7.1(c) and the Individual Rules and Practices of Judge George B. Daniels. According to the word-processing system used to prepare this document, this memorandum contains 6,504 words and has 20 pages. This word and page counts exclude the caption, table of contents, table of authorities, signature blocks, and this certificate of compliance.

/s/ *Drew C. Harris*
Drew C. Harris

22