# Exhibit 2

P58CsmoP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                       19 Cr. 382 (AKH)

DAVID SMOTHERMON,

          Defendant.

------------------------------x

                                 New York, N.Y.
                                 May 8, 2025
                                 11:36 a.m.

Before:

               HON. ALVIN K. HELLERSTEIN,

                             District Judge

                     APPEARANCES

JAY CLAYTON,
    United States Attorney for the
    Southern District of New York
BY:  RUSHMI BHASKARAN
    MATTHEW WEINBERG
    QAIS GHAFARY
    Assistant United States Attorneys

GEORGE D. MURPHY
    Attorney for Defendant

ALSO PRESENT:
    DARREN KIBEL, FBI
    CHRISTOPHER HARRIS, AUSA Paralegal

P58CsmoP

(Case called)

MS. BHASKARAN:  Good morning, your Honor.  Rushmi Bhaskaran, Matthew Weinberg, and Qais Ghafary for the government.  We're joined at counsel table by Christopher Harris, a paralegal specialist in our office, and Special Agent Darren Kibel of the FBI.

THE COURT:  Good morning, everyone.

MR. MURPHY:  Good morning, your Honor.  I'm George Murphy here on behalf of Mr. Smothermon, who is here in the courtroom.

THE COURT:  Good morning, Mr. Smothermon.

THE DEFENDANT:  Good morning.

THE COURT:  Mr. Smothermon, I understand that you wish to change your plea.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  From not guilty to guilty?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  In order for me to approve that, I must find that it's voluntary, that you understand the consequences and that there's an independent basis in fact.  So I'll be asking you questions, but you have to be under oath, which means you're telling me the truth, the whole truth, and nothing but the truth.  If you fail to do that, you open yourself up to more penalties.

THE DEFENDANT:  Yes, sir.

P58CsmoP

THE COURT:  Shall we swear you.

THE DEFENDANT:  I swear.

(Defendant sworn)

THE DEPUTY CLERK:  Please state your full name for the record.

THE DEFENDANT:  David Bruce Smothermon.

THE COURT:  How old are you, Mr. Smothermon?

THE DEFENDANT:  I'm 55 years old.

THE COURT:  Are you married?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Any children?

THE DEFENDANT:  I have one son.

THE COURT:  Is he over 21?

THE DEFENDANT:  He is 26 years old.

THE COURT:  How much schooling have you had?

THE DEFENDANT:  I have a master's degree in finance.

THE COURT:  From where?

THE DEFENDANT:  University of St. Thomas in Houston.

THE COURT:  Where were you born?

THE DEFENDANT:  Excuse me?

THE COURT:  Where were you born?

THE DEFENDANT:  Houston, Texas.

THE COURT:  So you are a citizen of the United States?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Coming into today, have you been taking

P58CsmoP

any medicines or narcotics or alcohol that could blur your thinking?

THE DEFENDANT:  No, your Honor.

THE COURT:  Are you totally aware now?

THE DEFENDANT:  Yes, I am.

THE COURT:  Have you discussed this case with your lawyer, Mr. Murphy?

THE DEFENDANT: Yes, your Honor.

THE COURT:  Have you received his advice?

THE DEFENDANT: Yes, your Honor.

THE COURT:  Are you satisfied with his services?

THE DEFENDANT: Yes, your Honor.

THE COURT:  Has anyone promised you anything to induce you to plead guilty?

THE DEFENDANT:  No, your Honor.

THE COURT:  Has anyone put you in fear or intimidation to cause you to feel to plead guilty?

THE DEFENDANT:  No, your Honor.

THE COURT:  Are you wanting to plead guilty because you feel it's the right thing for you to do in your circumstances?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And it's a voluntary act.

And you do understand that the government, in order to prove you guilty, must prove your guilt beyond a reasonable

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P58CsmoP

doubt to the satisfaction unanimously of a jury?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  You have a presumption of innocence, a constitutional presumption of innocence so that if the government doesn't succeed in its proof, you are innocent and you cannot be convicted.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And with help of the lawyer at a trial, you could confront all witnesses against you, cross examine them, call anyone to testify whether that person wishes to do so or not, and, if you wish, to testify yourself, but if you didn't want to testify, you wouldn't have to, and no inference could be drawn against you.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Pleading guilty gives up those rights.  So you do understand the consequences of pleading guilty?

THE DEFENDANT:  I do, your Honor.

THE COURT:  I understand from a letter of May 5, 2025, given to me this morning, signed by -- I don't have a signed copy, Ms. Bhaskaran.  Do you have a signed copy?

I take that back.  I see all the signatures.

You signed this, Mr. Smothermon, today in court?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  As did you, Mr. Murphy?

MR. MURPHY:  I did, your Honor.

THE COURT:  Did you go over this, Mr. Smothermon, with Mr. Murphy?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Did you go over this letter?  You have to speak.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And do you feel you understand everything in it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  I nevertheless have to go over with you the letter, so bear with me.

You are offering to plead guilty to Count One.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Of the superseding indictment.  That alleges that from approximately December 2015 to approximately September 2016, in the Southern District of New York and elsewhere, you knowingly devised and intended to devise a scheme, an artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, that you transmitted, caused to be transmitted over the wire, ways of executing that fraud, and specifically that you concealed substantial losses in your trading book by causing false entries to be made in an accounting system used by the financial firm for which you

P58CsmoP

worked and mismarked, and caused them to mismark your trading positions leading to a material overvaluation of assets that you held, and that you did this in order to obtain a discretionary bonus to which you would otherwise not have been entitled, and in connection with, and in furtherance thereof, you caused others to send and receive, and sent and received yourself, emails and other electronic communications to and from the Southern District of New York and elsewhere in furtherance of the scheme.

You're aware of those allegations?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And those are the ones to which you want to plead guilty?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Now, I want to read out to you the maximum terms of punishment that goes with this guilty plea.

The charge actually is -- can be said by wire fraud. The statute is 18 U.S.C. Section 1343.  It carries a maximum term of imprisonment of 20 years, a maximum term of supervised release of 3 years, a maximum fine of the greatest of $250,000, or twice the gross pecuniary gain, or twice the gross pecuniary loss that you caused, and also a mandatory special assessment of $100.  And there is loss, restitution to repay the person.

You're aware, I take it, of the statutory penalties?

THE DEFENDANT:  Yes, your Honor.

P58CsmoP

THE COURT:  There's an allegation of forfeiture, and I see that there is a consent that you signed to a preliminary order of forfeiture.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  It's also signed by the government.  Does the government wish me to sign that now?

MS. BHASKARAN:  Yes, your Honor.

THE COURT:  I signed it and have given it to Ms. Jones for filing.

Now, in implementation of the statutory penalties, there are sentencing guidelines the judge uses as a first step in sentencing.  I'm not bound by them.  I have not prepared these and I don't know whether I agree with them or not.  I have to make my own independent findings at the time of sentencing.  It's possible I may sentence you more severely or less severely than you anticipate.  By entering this agreement, you should know that however disappointed you might be by what I do, it's not a ground to get out of your plea.  Once I accept your plea, you're bound by it.

Do you understand?

THE DEFENDANT:  I do, Judge.

THE COURT:  It does not bind me in fixing sentence, I retain discretion, but you are bound.  Yes?

THE DEFENDANT:  I understand, your Honor, yes.

THE COURT:  Under the guideline range, driven very

P58CsmoP

much by the amount of loss being more than $9,500,000 or less than $25 million, the probation office or the government calculates that your net offense level is 26, and that offense level, the system worked out by the sentencing commission to grade the seriousness of each crime that is in the crime book, and it goes from 1 to 43.  You're at level 26.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  You also have no criminal history.  So the indicated range of punishment is 63 to 78 months.

You understand that, right?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  I'm not bound by that.  I can go low, I can go above, I can go within.

THE DEFENDANT:  Your Honor, I understand.

THE COURT:  You have promised in this agreement that if I sentence you within the guidelines or below them, you will not take an appeal and you will not challenge at a later date, we call a collateral challenge.

THE DEFENDANT:  Yes, your Honor.

THE COURT:  The plea of guilty and the sentence, you're aware of that?

THE DEFENDANT:  Yes.

THE COURT:  However, if I sentence within the guidelines or above the guidelines, you can appeal.  Sorry.  I misstated it.  If I sentence you above the guidelines, you can

appeal. And from the point of the view of the government, they have a right to appeal, as well, but only if I sentence you below the guidelines.

You're aware of that?

THE DEFENDANT: Yes, your Honor.

THE COURT: We have grounds of departure from the guidelines and variances from the guidelines. You've agreed that departures are not applicable, but you retain the right to tell me anything you think is relevant as a way to persuade me in my discretion to vary the sentence below the guidelines.

You're aware of that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Is there anything more the government wishes me to go into with this plea agreement?

MS. BHASKARAN: Yes, your Honor. If you might, could you please advise or I think it would be helpful to note the defendant's restitution obligation as well as the waiver with respect to restitution. So the restitution agreement is on page 2 in the first full paragraph in the amount of $19,550,081, of which $8 million is due within two weeks of today.

THE COURT: Are you aware of --

THE DEFENDANT: Yes, your Honor.

THE COURT: You have an obligation to repay $19,550,081?

P58CsmoP

THE DEFENDANT: Yes, your Honor.

THE COURT: You understand that. And you've agreed that the first payment towards that amount of $8 million would be made within two weeks of today?

THE DEFENDANT: Yes, your Honor.

THE COURT: That is by May 21.

THE DEFENDANT: Yes, your Honor.

THE COURT: Have you made provisions to pay that, money in your account?

THE DEFENDANT: Yes, I am working on it. Yes, it will be available.

THE COURT: What's the other point?

MS. BHASKARAN: Yes, your Honor. On page 4 of the agreement, the defendant agrees not to appeal or bring a collateral challenge of any restitution amount that is less than or equal to the $19 million amount that we just talked about.

THE COURT: You're aware of that?

THE DEFENDANT: Yes, your Honor.

MS. BHASKARAN: Your Honor, may I also ask the Court to just make some inquiries about his trial rights.

And I apologize if the Court covered this and I missed it, but could you please advise the defendant that he has the right to be represented by counsel at all stages of this proceeding, and could he not afford counsel, that the Court

P58CsmoP

would appoint one for him.

THE COURT:  You're aware of that, Mr. Smothermon?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Good.  Anything else, Ms. Bhaskaran?

MS. BHASKARAN:  Not so far.

THE COURT:  How would the government go about proving guilt?  What are the material allegations you have to prove and how would you prove it?

MS. BHASKARAN:  Certainly.  So let me start with the essential elements of the crime of wire fraud.  There are three essential elements.

First, that there was a scheme or artifice to defraud, or to obtain money or property by materially false and fraudulent pretenses, representations, or promises;

Second, that the defendant knowingly participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with a specific intent to defraud; and

Third, that in execution of that scheme, the defendant used, or caused the use of, interstate wires.

In addition to proving those essential elements beyond a reasonable doubt, the government would need to prove venue in the Southern District of New York by a preponderance of the evidence.

If this matter were to proceed to trial, the government's evidence would consist of the following, among

P58CsmoP

other things:  It would include expert testimony to the effect that the defendant mismarked his trading book in a manner that concealed the extent of his trading losses, it would include testimony that defendant --

THE COURT:  What was the nature of the expert?

MS. BHASKARAN:  The expert is someone from the financial services industry with experience in accounting and risk management.  He has reviewed the defendant's trading, a mark of his trading portfolio for certain contracts, compared it with other market data, and has concluded that the defendant mismarked his trading portfolio substantially.

THE COURT:  It's a matter of comparing trading slips and general records?

MS. BHASKARAN:  I think at a high level, yes, your Honor, I think that's right.

In addition to that --

THE COURT:  So it's an accountant's work.  So you have a forensic accountant lined up as an expert?

MS. BHASKARAN:  He's a chief risk officer with that sort of expertise in accounting and financial modeling.

In addition to the expert testimony, there would be testimony that the defendant misrepresented the values of certain contracts by directing that prices and quantities that were inputted into the victim's accounting system will be misrepresented and that to conceal the extent of his losses.

P58CsmoP

THE COURT:  How did he do that?

MS. BHASKARAN:  So the victim company had an accounting system that tracked various physical contracts that traders entered into.  And so after these contracts were entered into, the prices and quantities would be put into the system.  This part is pretty simple.  The government's evidence would show that the defendant directed an employee to change the prices or quantities of those contracts in the accounting system to make those contracts seem more profitable or to conceal the degree of the losses on those contracts.

THE COURT:  Who is the victim?

MS. BHASKARAN:  The victim is a trading firm that's headquartered in the United States that engages in oil and gas commodities trading and physical trading.

THE COURT:  It's the employer of --

MS. BHASKARAN:  The employer of the defendant, yes.

Furthermore --

THE COURT:  So what he did, what he did was to falsify records to show profits that didn't exist and to mask losses that did exist, and he did this by manipulating the books and records to reflect the world he wanted to have seen rather than the actual world in which he traded?

MS. BHASKARAN:  That's correct, your Honor.

In addition, your Honor, there would be a witness who would testify that the defendant admitted to mismarking his

P58CsmoP

book.

Furthermore, with respect to the property interest here --

THE COURT:  Let me ask another question before we get into in that.  How was it that the cash flow analyses didn't show the difference?

MS. BHASKARAN:  So some of these contracts were set to the future.  So some of these profits, as I understood it, were unrealized gains.  And to the extent that there were discrepancies between cash flow --

THE COURT:  In other words, the profit wasn't realized until a future date.  So although there will be a book profit shown because of the fraud of the nature of the recordkeeping, the actual realization of the money had to wait a longer time.  They're working with an accrual system, so it couldn't be tolled until a year later?

MS. BHASKARAN:  I think that's part of it, your Honor.

In addition, to the extent that there were discrepancies that were seen at the time that the fraud was occurring, the defendant was offering explanations to explain the differences between cash flows and the representations he was making about the value of his trading portfolio.

THE COURT:  Okay.  And there's a benefit.  How does he get the benefit?

MS. BHASKARAN:  The testimony, if I could also include

P58CsmoP

that the testimony at trial would also include admissions that the defendant engaged in mismarking.

There would be testimony that the defendant was eligible for a discretionary bonus, and the testimony at trial would show that the defendant's bonus was discretionary and would not have been awarded had his employer — the victim — known about the extent of these trading losses, which had been concealed from the victim through the mismarking that we described.

In addition --

THE COURT:  How would you show that?

MS. BHASKARAN:  That would be through witness testimony, including from witnesses who were responsible for the compensation policy at the victim and who were responsible for the decision to award the bonus that's at issue here.  That witness would testify in sum and substance that had he known the true nature of the defendant's trading performance, which was concealed to the victim as a result of this mismarking, this discretionary bonus would not have been awarded.

THE COURT:  And that discretion bonus was awarded what date?

MS. BHASKARAN:  That bonus was awarded as of May 2016.

THE COURT:  And that referred to profits in the year 2015?

MS. BHASKARAN:  Yes.  The profits as of 2015 were the

P58CsmoP

starting point for the bonus.  That was the pot of cash, basically, was determined by profits from 2015's calendar year.  However, the decision to award the bonus was discretionary.  It was made in May 2016, and the witness would testify that the defendant's trading performance and his losses as of 2016 were material and would have impacted the bonus decision in the manner I just described.

THE COURT:  So even though the bonus was made on the basis of 2015 earnings?

MS. BHASKARAN:  Yes.  The pot of cash available for the bonus was based on 2015 profits.  The decision --

THE COURT:  And ending the calendar year 2015?

MS. BHASKARAN:  Yes.  So that determined --

THE COURT:  And in May of 2016, he was paid a bonus for that?

MS. BHASKARAN:  Based on the 2016 profits.  However, the bonus was still discretionary and the Q1 performance in 2016 was material to --

THE COURT:  So if he had lost money in a month in 2016, of two months in 2016, it would not have meant anything in the course of the calendar year.

MS. BHASKARAN:  Your Honor, the witness testimony would be that there was significant mismarking in the first quarter of 2016, and had they known about that significant mismarking, that bonus would not have been awarded.  And

P58CsmoP

furthermore, that those representations that were made were -- or misrepresentations were material.

THE COURT:  If they knew that there were mismarkings, they would not have made the bonus, clearly, because you would never want to award a dishonest employee.  However, the question is whether he had incurred losses and accurately reported those losses, would that have despoiled the bonus in May?

MS. BHASKARAN:  Your Honor, our understanding of the testimony is the answer that question would be yes because the nature of the losses were so significant.

THE COURT:  Okay.

MS. BHASKARAN:  And the final piece of evidence that I'll put on the record is that the government's evidence would also include wires, such as emails between Texas where the defendant resides and Manhattan where the victim is located related to this scheme that I just described.

THE COURT:  Thank you.

And all this took place --

MS. BHASKARAN:  In terms of timing, it is between December 2015 to September of 2016 -- where?

THE COURT:  Where.

MS. BHASKARAN:  The victim here was located in Manhattan in New York City, the defendant was based in Houston, but sent wires, emails between Houston and Manhattan.

P58CsmoP

THE COURT:  At any rate, the defendant interested to challenge venue, Mr. Murphy?

MR. MURPHY:  Your Honor, we did early on in the process, and the Court denied our request to change venue to --

THE COURT:  Your issue is preserved for the appellate court.

MR. MURPHY:  It was, yes.

THE COURT:  And could be made after trial if the government doesn't prove by a preponderance the proper venue.

MR. MURPHY:  Yes, your Honor.

THE COURT:  By this plea, though, you waive your challenge?

MR. MURPHY:  Yes, your Honor.

THE COURT:  Have you reviewed the proofs that have been outlined by Ms. Bhaskaran?

MR. MURPHY:  I have, your Honor.  I've gone over it with Mr. Smothermon.

THE COURT:  Do you feel that Ms. Bhaskaran could make out a *prima facie* case?

MR. MURPHY:  I do, your Honor.

THE COURT:  Do you know of any defenses that could trump the proofs?

MR. MURPHY:  No, your Honor.

THE COURT:  Mr. Smothermon, are you offering to plead guilty because you believe you are really in fact guilty of the

P58CsmoP

crime charged?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Please tell me what it is you're guilty of.

THE DEFENDANT:  I worked for a financial firm named Termo, which was headquartered in New York City and within the Southern District of New York.  Part of my job was to make financial trades and to value my trades by marking them in Termo's accounting system.  In 2016, I intentionally overvalued some of the trades I had made.  I did this to obtain a discretionary bonus that I had earned from the prior year.  I knew that my actions and mismarking my book would cause Termo to use email, and I also used email to further the scheme.  I overvalued the trades in order to deceive Termo into believing the value of my trading book was higher than it actually was.

THE COURT:  Who is Termo?

THE DEFENDANT:  My employer at the time.

THE COURT:  Now what is it that you feel a bonus you earned for your excellent in performance in 2015 would not have been paid to you if Termo understood the losses that you had incurred in the first five months of 2016?

THE DEFENDANT:  I think more than anything, it just would have been wrong, the losses.  And I'm not even sure what month exactly they occurred, but --

THE COURT:  Well, you had motivation to falsify your

P58CsmoP

records.  But when you falsified your records, were you in mind that your bonus the previous year was in jeopardy?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And that's why you falsified the books?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  You know that what you were doing was wrong?

THE DEFENDANT:  I do, your Honor.

THE COURT:  Did I miss anything, Ms. Bhaskaran?

MS. BHASKARAN:  No, your Honor.  I believe that allocution is sufficient.

THE COURT:  Mr. Murphy?

MR. MURPHY:  No, your Honor.  Thank you.

THE COURT:  Mr. Smothermon, I accept your plea.  I find that your plea is voluntary, that you understand the consequences of your plea, and that there is an independent basis in fact to support the plea.

THE DEFENDANT:  Thank you, your Honor.

THE COURT:  The clerk of the court is instructed to enter a plea of guilty and to withdraw the plea of not guilty.

Sentencing will occur?

THE DEPUTY CLERK:  September 18th at 9:30.

THE COURT:  How about 10 o'clock.

THE DEPUTY CLERK:  10 o'clock.

THE COURT:  Is that good for you, Mr. Murphy?

P58CsmoP

MR. MURPHY:  Yes, your Honor.

THE COURT:  The probation department is instructed to prepare a presentence investigation report, to give Mr. Murphy an opportunity to attend if his client is interviewed.  I ask the government to obtain a copy of the transcript of this proceeding so that the probation officer can identify with it and not repeat in the interviews if he interviews Mr. Smothermon.

Anything else, Ms. Bhaskaran?

MS. BHASKARAN:  Nothing further, your Honor.  Thank you.

THE COURT:  Mr. Murphy.

MR. MURPHY:  No, your Honor.

THE COURT:  Conditions of bail continue.

MS. BHASKARAN:  Yes, your Honor.

THE COURT:  See you in September.

* * *